1 | **KRIS J. KRAUS**
California State Bar No. 233699
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California 92101-5030
Telephone: (619) 234-8467
4 | Kris_Kraus@fd.org

5 | Attorneys for Mr. Jose Lopez-Panagua

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE MARILYN L. HUFF)**

11 | UNITED STATES OF AMERICA,                )     CASE NO.: 08CR1355-MLH
                                              )
12 |              Plaintiff,                   )
                                              )
13 | v.                                        )
                                              )     STATEMENT OF FACTS AND
14 | JOSE LOPEZ-PANAGUA,                       )     MEMORANDUM OF POINTS AND
                                              )     AUTHORITIES IN SUPPORT OF MOTIONS
15 |              Defendant.                   )
                                              )
16 | _____ )

17 | **I.**

18 | <u>**STATEMENT OF FACTS**</u>[1]

19 |     Mr. Lopez-Panagua incorporates by reference the facts recounted in his previously filed motions.

20 | //

21 | //

22 | //

23 | //

24 | //

25 | //

26

27

28 | [1]     The statement of facts in the previous motions were based, in part, on materials received from the government. Mr. Lopez-Panagua does not accept this statement of facts as his own, and reserves the right to take a contrary position at motions hearing and trial. The facts alleged in these motions are subject to amplification and/or modification at the time these motions are heard

## II.

## THE INDICTMENT MUST BE DISMISSED BECAUSE IT DOES NOT ALLEGE INSPECTION AND ADMISSION BY AN IMMIGRATION OFFICER OR ACTUAL AND INTENTIONAL EVASION OF INSPECTION AT THE NEAREST INSPECTION POINT[2]

Regardless of how this Court resolves the issues posed by Parga-Rosas' disregard of the Fifth Amendment, the indictment is nonetheless deficient for failure to allege inspection and admission by an immigration officer or actual and intentional evasion of inspection at the nearest inspection point. See, e.g., Nyrienda v. I.N.S., 279 F.3d 620 (8th Cir. 2002) (setting forth the components of an entry under the immigration law).

A. *Pacheco-Medina* **Held that Section 1326 Employs the Definition of Entry Developed In Immigration Law.**

Pacheco-Medina explicitly held that section 1326 employs the definition of entry developed by the Board of Immigration Appeals. 212 F.3d at 1163-64 (citing Matter of Pierre, 14 I. & N. 467 (1973), additional citations omitted). While Pacheco-Medina was focused primarily on the "official restraint" requirement of the concept of "entry" under the immigration law, Id. at 1164, the Immigration law definition actually contains three separate components.

> An entry has several components: (1) a crossing into the territorial limits of the United States; (2) (a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

Nyrienda, 279 F.3d at 623 (citing Farquharson v. U.S. Attorney General, 246 F.3d 1317, 1321 (11th Cir. 2001) and Matter of Z-, 20 I. & N. 707, 708, 1993 WL 424164 (BIA 1993)); accord Yang v. Maugans, 68 F.3d 1540, 1549 (3d Cir. 1995); Correa v. Thornburgh, 901 F.2d 1166, 1171 (2d Cir. 1990); Matter of G-, 20 I. & N. 764, 768, 1993 WL 522159 (BIA 1993). Thus, in addition to freedom from restraint, an "entry" also requires proof that the alien "cross[ed] into the territorial limits of the United States," and that he be "inspect[ed] and admi[tted] by an immigration officer, *or* ... [that the alien] actual[ly] and intentional[ly] eva[ded] ... inspection at the nearest inspection point." Id. (emphasis added).

//

---

[2] Defense counsel acknowledges the Ninth Circuit's decision in Rivera-Sillas, 376 F.3d 887 (9th Cir. 2004), and raises this argument for purposes of litigation in a higher court.

1 **B.**    **The Indictment Fails To Allege the Three Components of an "Entry."**

2        As noted above, the Indictment alleges only that Mr. Lopez-Panagua was "found" in the United

3 States. Assuming, arguendo, that this allegation satisfies the requirement that the alien "cross[] into the

4 territorial limits of the United States," Nyrienda, 279 F.3d at 623, it fails to allege the second two components:

5 "inspection and admission by an immigration officer, or ... actual and intentional evasion of inspection at the

6 nearest inspection point; and ... freedom from official restraint." Id.  Assuming further that this Court adheres

7 to the Ninth Circuit's dubious reasoning in Parga-Rosas, and ignores the conflict with Buckland, the latter of

8 these two requirements, the lack of official restraint, need not be alleged.  See Parga-Rosas, 238 F.3d at 1213-

9 14 (discussing the requirement that the "person [be] free from official restraint" but failing to address the

10 inspection issues). Because Parga-Rosas does not address the inspection component of the definition of entry,

11 Id., it is has no bearing on the question here: must fulfillment of the inspection requirement be alleged in the

12 Indictment?

13        Although the inspection component of "entry" is not included in the statutory language of section

14 1326, merely tracking the statutory language does not suffice where, as is the case here, the offense contains

15 elements, or material facts, that are not included in the statutory language: "[i]mplied, necessary elements, not

16 present in the statutory language, must be included in an Indictment." United States v. Jackson, 72 F.3d 1370,

17 1380 (9th Cir. 1995); accord United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999). In fact, a mere

18 citation to the statutory language is ordinarily "not sufficient" to plead a criminal charge in an Indictment,

19 unless "'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set

20 forth all the elements necessary to constitute the offence intended to be punished.'" United States v. Hamling,

21 418 U.S. 87, 117 (1974) (quoting United States v. Carll, 105 U.S. 611, 612 (1881)); accord United States v.

22 Britton, 107 U.S. 655, 661 (1883) (same); see also Russell v. United States, 369 U.S. 749, 765 (quoting

23 United States v. Cruikshank, 92 U.S. 542, 558 (1875)) ("'[i]t is an elementary principle of criminal pleading,

24 that where the definition of an offense ... includes generic terms, it is not sufficient that the Indictment shall

25 charge the offense in the same generic terms as in the definition; but it must state the species, – it must

26 descend to particulars'").

27        Because Pacheco-Medina has adopted the immigration definition of entry for application in section

28 1326 "found in" cases," 212 F.3d at 1163-64, and because four Circuits and the Board of Immigration Appeals

1  have held that an entry requires "inspection and admission by an immigration officer, or . . . actual and

2  intentional evasion of inspection at the nearest inspection point," see, e.g., Nyrienda, 279 F.3d at 623, the

3  inspection component of an "entry" is an element, or material fact, of a "found in" case. Therefore, it must be

4  included in the Indictment. Jackson, 72 F.3d at 1380; accord Du Bo, 186 F.3d at 1179.

5       There is another reason that the Indictment must specify whether there was "inspection and

6  admission by an immigration officer, *or* ... actual and intentional evasion of inspection at the nearest

7  inspection point." Nyrienda, 279 F.3d at 623 (emphasis added). Not only must the Indictment "contain[] the

8  elements of the offense intended to be charged," it must also "sufficiently apprise[] the defendant of what he

9  must be prepared to meet." Russell, 369 U.S. at 763 (internal quotations, citation omitted). Because the

10 Indictment alleges only that he was "found," Mr. Lopez-Panagua has no idea whether the government intends

11 to show that he was inspected and admitted, or whether he actually and intentionally evaded inspection.

12 Nyrienda, 279 F.3d at 623. Nor does he know whether he was indicted for a voluntary entry or voluntarily

13 remaining in the United States. See Quintana-Torres, 235 F.3d at 1200 (a found in case may be based upon

14 a voluntary entry or "voluntarily remaining in the country"). As a result, the Indictment fails to give him the

15 notice guaranteed by the Fifth and Sixth Amendments.

16                                      **III.**

17 **THE INDICTMENT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE THE *MENS***
   **_REA_ ELEMENT OF THE CHARGED OFFENSE[3]**
18

19      The Indictment charges Mr. Lopez-Panagua with being an alien found in the United States after

20 deportation in violation of 8 U.S.C. § 1326(a). The Indictment fails to allege an element necessary to convict

21 Mr. Lopez-Panagua of the offense: that Mr. Lopez-Panagua knew he was in the United States, that he was an

22 alien, that he had previously been deported and that he had not been granted permission to reenter. As a

23 consequence, it must be dismissed. See Du Bo, 186 F.3d at 1179.[4]

24 //

25

26 [3]    Defense counsel acknowledges the Ninth Circuit's recent decision of Rivera-Sillas, 376 F.3d 887 (9th
27 Cir. 2004), and raises this argument for purposes of litigation in a higher court.

28 [4]    The Indictment also fails to allege Mr. Lopez-Panagua's knowledge of his deportation, alienage and
   lack of permission to return. These omissions also require reversal.

1    Unless a statute unambiguously dispenses with scienter, criminal statutes are presumed to contain

2  a *mens rea* requirement. <u>See</u>, *e.g.*, <u>United States v. X-Citement Video, Inc.</u>, 513 U.S. 64, 70 (1994)

3  (recognizing that "our cases interpret[] criminal statutes to include broadly applicable scienter requirements,

4  even where the statute by its terms does not contain them"); <u>Staples v. United States</u>, 511 U.S. 600, 606

5  (1994) (citing <u>Liparota v. United States</u>, 471 U.S. 419, 426 (1985)) (stating that "offenses that require no *mens*

6  *rea* generally are disfavored" and suggesting that "some indication of congressional intent, express or implied,

7  is required to dispense with *mens rea* as an element of a crime"). This presumption in favor of scienter

8  "requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct

9  from 'otherwise innocent conduct.'" <u>Carter v. United States</u>, 530 U.S. 255, 268 (2000) (quoting <u>X-Citement</u>

10  <u>Video</u>, 513 U.S. at 72). Consistent with this presumption, the Supreme Court has consistently interpreted

11  statutes to require, at a minimum, proof that the defendant knew the facts that rendered his conduct unlawful.

12  <u>See</u>, *e.g.*, <u>Carter</u>, 530 U.S. at 268 (knowledge of the facts that defendant is forcefully taking property).

13    Here, section 1326(a) sets forth no express knowledge element. <u>See</u> 8 U.S.C. § 1326(a). However,

14  the historical presumption in favor of scienter requires, as it did in <u>Staples</u> and <u>Carter</u>, proof that the defendant

15  knew the facts that rendered his conduct illegal. Because section 1326(a) prohibits a deported alien from being

16  found in the United States, the defendant must know all of the facts that render his conduct illegal. In other

17  words, he must know that he is in the United States, that he was previously deported, that he is an alien and

18  that he has not been granted permission to reenter.[5] <u>See</u> <u>United States v. Carlos-Colmenares</u>, 253 F.3d 276,

19  279 (7th Cir. 2001) (recognizing that the elements of a section 1326 offense include that the alien was

20  deported, that he "knowingly returned" to the United States, and that he did not have the express consent of

21  the Attorney General to return).

22  //

23

24    [5]    This knowledge requirement is consistent with, and supported by, the Ninth Circuit's decision in <u>Pena-Cabanillas v. United States</u>, 394 F.2d 785, 790 (9th Cir. 1968). <u>Penas-Cabanillas</u> held that the government

25  need not prove that a defendant "specifically intended" to reenter the United States. <u>Id</u>. However, "[t]here still must be the general intent to do the prohibited act, to-wit enter." <u>Id</u>. As <u>Staples</u> and <u>Carter</u> recognize, general

26  intent requires the government to prove that the defendant knew the facts underlying the criminal conduct. Thus, because section 1326(a) is a "general intent" offense, the defendant must know the facts that render his

27  conduct illegal: he must know that he is in the United States. To the extent <u>Pena-Cabanillas</u> may be read to

28  hold that the only mens rea necessary for a found in case is voluntariness, it is no longer good law in light of <u>Carter</u>.

1    Such a requirement is necessary to distinguish innocent conduct from guilty conduct. A deported

2  alien who is in Mexico has broken no United States law. Just like the knowledge requirement in Staples

3  protected those who innocently believed that they possessed a firearm in the general sense and not a machine

4  gun, the knowledge requirement here protects those who innocently believe that they are in Mexico, rather

5  than the United States. There is no indication that Congress intended to create a strict liability offense, and

6  the Ninth Circuit's decision in Pena-Cabanillas and the presumption in favor of scienter require the opposite

7  conclusion. Thus, section 1326 requires, as an element of the offense, proof that the defendant knew he was

8  in the United States, that he was an alien, that he had previously been deported and that he had not been

9  granted permission to reenter. Since the Indictment fails to allege mens rea the Indictment must be dismissed.

10                                    **IV.**

11  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'
    INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN
12  AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH
    AMENDMENT BY DEPRIVING MR. LOPEZ-PANAGUA OF THE TRADITIONAL
13                        FUNCTIONING OF THE GRAND JURY**

14  **A.    Introduction.**

15    The indictment in the` instant case was returned by the January 2007 grand jury. That grand jury was

16  instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See

17  Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto

18  as Exhibit A. Judge Burns' instructions to the impaneled grand jury deviate from the instructions at issue in

19  the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

20  several ways.[6]  These instructions compounded Judge Burns' erroneous instructions and comments to

21  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

22  at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto

23  as Exhibit B.[7]

24  _____

25  [6]    See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
    Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United
26  States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299
27  F.3d 1156 (9th Cir. 2002) (per curiam).

28  [7] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the
    grand jury. Mr. Lopez-Panagua requests that the video presentation be produced. See United States v. Alter,

1. **Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[8] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns' emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

---

482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[8] See also id. at 20 ("You're all about probable cause.").

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Lopez-Panagua will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror

"[didn't] like what our government is doing," <u>see</u> <u>id.</u> at 17, but in which there was probable cause.  <u>See</u> <u>Id.</u> Such a case "should go forward." <u>See</u> <u>id.</u>  Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." <u>See</u> <u>id.</u>  Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." <u>See</u> <u>id.</u> at 24.  Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.  We want you to make a business-like decision of whether there was a probable cause . . . .

<u>Id.</u> at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases.  <u>See</u> <u>id.</u> at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." <u>See</u> <u>id.</u> That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make.  But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed.  It's not for me to say, "well, I don't like it.  So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against criminalizing some drugs.

//

1   That's not what your prerogative is here.  You're prerogative instead is to act like a judge
    and say, "all right.  This is what I've to  deal with objectively.  Does it seem to me that a
2   crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  *And
    then your obligation, if you find those to be true, would be to vote in favor of the case going
3   forward.*

4   Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both

5   questions are answered in the affirmative, lead to an "obligation" to indict.

6   Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

7   paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

8   to indict in every case in which there was probable cause.

9   The Court: Do you think you'd be inclined to let people go in drug cases even though you
    were convinced there was probable cause they committed a drug offense?
10  REA: It would depend on the case.
    The Court: Is there a chance that you would do that?
11  REA: Yes.
    The Court: I appreciate your answers.  I'll excuse you at this time.
12

13  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

14  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

15  should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

16  indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge Burns

17  made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

18  hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

19  because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[9]

20  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

21  a risk to run.

22  //

23  //

24  _____

25  [9]     This point is underscored by Judge Burns' explanation to the Grand Jury that a magistrate judge will
    have determined the existence of probable cause "in most circumstances" before it has been presented with
26  any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case
    because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury
27  for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in
    most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the
28  evidence presented.

### 2.     The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.[10]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

---

[10]     These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").
Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns' instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.
In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

2  adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus,

3  Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

4  "adverse" or "that cuts against the charge." See id.

**B.     Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

7          The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

8  grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

9  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

10 approach[11] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

11 the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand

12 jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January

13 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

14 bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

15 exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United

16 States v. Williams, 504 U.S. 36, 49 (1992).

17         For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

18 II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

19 deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

20 as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

21 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

22 I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

23 prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that

24 the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

25 also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

26

27 [11]     See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because

28 "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1   prosecutor." Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

2   the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

3   "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

4   that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

5   § 15.2(g) (2d ed. 1999)).

6       Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

7   in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

8       The grand jury thus determines not only whether probable cause exists, but also whether
        to "charge a greater offense or a lesser offense; numerous counts or a single count; and
9       perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis
        of the same facts.  And, significantly, the grand jury may refuse to return an indictment
10      even "'where a conviction can be obtained.'"

11  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

12  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

13  not only the initial decision to indict, but also significant questions such as how many counts to charge and

14  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

15  crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

16  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

17  to indict someone even when the prosecutor has established probable cause that this individual has committed

18  a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,

19  dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

20  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

21  But not in Judge Burns's instructions.

22  **C.    Judge Burns' Instructions Forbid the Exercise of Grand Jury Discretion Established in Both**

23      ***Vasquez* and *Navarro-Vargas II*.**

24      The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

25  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

26  in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every

27  finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at

28  1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

1  pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of

2  the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors,

3  and thus to circumscribe the grand jury's constitutional independence.").  See also id. ("The 'word' should is

4  used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579

5  (1999) (brackets in original)).

6      The debate about what the word "should" means is irrelevant here; the instructions here make no

7  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

8  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

9  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

10  indicting even though I think that the evidence is sufficient'. . . ."  See Ex. A at 8-9.  Thus, the instruction flatly

11  bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

12  would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez,

13  474 U.S. at 264.

14      While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

15  an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only

16  mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

17  only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

18  probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it would

19  strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

20  jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was

21  not.

22      The full passage cited above effectively eliminates any possibility that Judge Burns intended the

23  Navarro-Vargas spin on the word "should."

24      [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
       crime was committed?  And second, do we have a reasonable belief that the person that

25      they propose that we indict committed the crime?"

26      If the answer is "yes" to both of those, then the case should move forward.  If the answer
       to either of the questions is "no," then the grand jury should not hesitate and not indict.

27

28  See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that

1   if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

2   room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205

3   (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the

4   innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities

5   continue to include both the determination whether there is probable cause and the protection of citizens

6   against unfounded criminal prosecutions.") (citation omitted).

7           By the same token, if Judge Burns said that "the case should move forward" if there is probable

8   cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

9   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

10  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

11  been his intent.  But even if it were, no grand jury could ever have had that understanding.[12]  Jurors are not

12  presumed to be capable of sorting through internally contradictory instructions.  See generally United States

13  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

14  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

15          Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

16  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

17          **(1)**     The first occasion occurred in the following exchange when Judge Burns conducted voir dire

18  and excused a potential juror (CSW):

19          The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
            you to say, "Well, yeah, there's probable cause.  But I still don't like what the government
20          is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's
            your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
21          Prospective Juror: Well, I think I may fall in that category.
            The Court: In the latter category?
22          Prospective Juror: Yes.
            The Court: Where it would be difficult for you to support a charge even if you thought the
23          evidence warranted it?
            Prospective Juror: Yes.
24          The Court: I'm going to excuse you then.

25

26

---

27  [12]     This argument does not turn on Mr. Lopez-Panagua's view that the Navarro-Vargas/Marcucci reading
    of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which
28  the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-
    Vargas/Marcucci reading as a possibility.

1  See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

2  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

3  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

4  wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

5  was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

6  the exercise of discretion by any other prospective grand juror.

7         **(2)**        In an even more explicit example of what "should" meant, Judge Burns makes clear that it

8  there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

9  Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

10       You'd have a similar *obligation* as a grand juror even though you might have to grit your
11       teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote
         against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote
12       against criminalizing some drugs.

13       That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and
         to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that
14       a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."
         *And then your obligation, if you find those things to be true, would be to vote in favor of*
15       *the case going forward.*

16  Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

17  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

18  convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded:

19  "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and

20  contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no

21  prerogative to do anything other than indict if there is probable cause.

22         Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

23  a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

24  rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

25  indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

26  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

27  scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

28  prospective jurors, because his message is that there is no discretion not to indict.

1       **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point

2   home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

3   on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

4   here."  See id. at 61.

5       **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in

6   every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

7   reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

8   that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what

9   the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

10      Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

11  penalties to which indicted persons may be subject.

12          Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case
               is about because there is a disparity between state and federal law.

13          The Court:  In what regard?
               Prospective Juror: Specifically, medical marijuana.

14          The Court:  Well, those things -- the consequences of your determination shouldn't concern
               you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of*

15          *course, that they cannot consider the punishment or the consequence that Congress has set*
               *for these things.  We'd ask you to also abide by that.*  We want you to make a business-like

16          decision of whether there was a probable cause . . . .

17  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

18  would obviously leave no role for the consideration of penalty information.

19      The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

20  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

21  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

22  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

23  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

24  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

25  consideration of penalty information.  See 474 U.S. at 263.

26      Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

27  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

28  was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

1  contradiction of the Supreme Court's decision in <u>Vasquez</u>.  Indeed, it defies credulity to suggest that a grand

2  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

3  <u>Vasquez</u>:

> 4  The grand jury does not determine only that probable cause exists to believe that a
> defendant committed a crime, or that it does not.  In the hands of the grand jury lies the
> 5  power to charge a greater offense or a lesser offense; numerous counts or a single count;
> and perhaps most significant of all, a capital offense or a non-capital offense – all on the
> 6  basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case
> where a conviction can be obtained."
> 7

8  474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J.,

9  dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

10  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

11  charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor

12  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u>

13  <u>id.</u> at 264.  Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury.  The instructions therefore represent

14  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

15  jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

16  therefore be dismissed. <u>Id.</u>

17      The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

18  instructions excesses.  The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

19  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

20  408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may have on a grand

21  jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at

22  1202 (emphases in the original).

23      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

24  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

25  of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting).  The

26  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

27  making a probable cause determination . . . unconstitutionally undermines the very structural protections that

28  the majority believes save[] the instruction." <u>Id.</u>  After all, it is an "'almost invariable assumption of the law

1  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

2  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

3  in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

4  instructions because nothing will happen if they disobey them." Id.

5        In setting forth Judge Hawkins' views, Mr. Lopez-Panagua understands that this Court may not adopt

6  them solely because the reasoning that supports them is so much more persuasive than the majority's

7  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

8        Here, again, the question is not an obscure interpretation of the word "should", especially in light of

9  the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

10 Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

11 right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

12 Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

13        Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

14 they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

15 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle . . . ." See

16 Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

17 embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

18 conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand

19 jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of

20 government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

21 1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

22 their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and,

23 here, Judge Burns has both fashioned his own rules and enforced them.

24 **D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present
         Exculpatory Evidence to the Grand Jury.**

25

26        In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

27 argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

28 exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

1    common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory'

2    judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority

3    "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

4    amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

5    Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does

6    not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47

7    (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative,

8    rules of grand jury procedure." Id. at 50.  As a consequence, Williams rejected the defendant's claim, both

9    as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

10          Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

11   present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

12          Now, again, this emphasizes the difference between the function of the grand jury and the
      trial jury.  You're all about probable cause.  If you think that there's evidence out there that
13    might cause you say "well, I don't think probable cause exists," then it's incumbent upon
      you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*
14    *duty-bound to present evidence that cuts against what they may be asking you to do if*
      *they're aware of that evidence.*
15

16   Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

17   duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

18   [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

19   id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See

20   Navarro-Vargas, 408 F.3d at 1207.

21          This particular instruction has a devastating effect on the grand jury's protective powers, particularly

22   if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

23   conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20.  Thus, once again,

24   the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

25   probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

26   would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

27   should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

28   will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

1  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

2  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

3  you to do if they're aware of that evidence."  <u>See</u> <u>id.</u>  Moreover, during voir dire, Judge Burns informed the

4  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that

5  cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  <u>See</u> Ex. B at 14-15

6  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the

7  "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from

8  of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  <u>See</u>

9  Ex. A at 27.

10      These instructions create a presumption that, in cases where the prosecutor does not present

11  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

12  exculpatory evidence was presented, would proceed along these lines:

13      (1)    I have to consider evidence that undercuts probable cause.

14      (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

15          evidence to me, if it existed.

16      (3)    Because no such evidence was presented to me, I may conclude that there is none.

17  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

18  presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

19  prosecutor would have presented it.

20      The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

21  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

22  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

23  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

24  the Fifth Amendment.

25              **V.**

26          <u>**REQUEST FOR THE GRAND JURY TRANSCRIPT**</u>

27      Mr. Lopez-Panagua is requesting a copy of the transcript of the presentment of this case to the grand

28  jury. The transcript is needed to examine the record of what specific instructions were given to the grand

1  jurors relating to their powers, the charges, and necessary elements of the offenses. Based in part of the review

2  of the Grand Jury Instructions previously given, Mr. Lopez-Panagua believes that the grand jury in his case

3  was improperly instructed on elements of the charge. The Fifth Amendment Requires that "all elements of

4  the offense [be] considered and found by the grand jury." United States v. Hooker, 841 F.2d 1225, 1230 (4th

5  Cir. 1988) (citing Stirone v. United States, 361 U.S. 212 (1960)). Mr. Lopez-Panagua has already filed an

6  attack on the indictment based in part on faulty grand jury instructions, and seeks to file an additional motion

7  dealing with the specific instructions given to the grand jury in his case. A transcript of the presentment of

8  the elements of the offense is the only means by which Mr. Lopez-Panagua can make his record.

9        FED. R. CRIM. P. 6(e)(3)(E) states:

10       The court may authorize disclosure -- at a time, in a manner, and subject to any other
         conditions that it directs -- of a grand-jury matter:

11       . ...
         (ii) at the request of a defendant who shows that a ground may exist to dismiss the

12       indictment because of a matter that occurred before the grand jury.

13  FED. R. CRIM. P. 6(e)(3)(E) (emphasis added).

14       While grand jury proceedings are usually secret, see Rule 6(e)(2), exceptions are made when a

15  defendant "shows that a ground may exist to dismiss the indictment." Rule 6(e)(3)(E)(ii).  Disclosure of the

16  grand jury transcript is the only manner in which Mr. Lopez-Panagua can ascertain whether the grand jury was

17  properly instructed on the charges.

18       In cases dealing with the testimony of witnesses, courts have allowed the production of grand jury

19  transcripts, when a specific need has been shown. In Douglas Oil Co. of California v. Petrol Stops Northwest,

20  441 U.S. 211 (1979), the Supreme Court held that "[p]arties seeking grand jury transcripts under Rule 6(e)

21  must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding,

22  that the need for disclosure is greater than the need for continued secrecy, and that their request is structured

23  to cover only material so needed." Id. at 222.  See also Dennis v. United States, 384 U.S. 855, 869 (1966).

24  The calculus undertaken by courts has hinged upon the secrecy of the information requested.

25       "It is clear . . . that disclosure is appropriate only in those cases where the need for it
         outweighs the public interest in secrecy, and that the burden of demonstrating this balance

26       rests upon the private party seeking disclosure.  It is equally clear that as the considerations
         justifying secrecy become less relevant, a party asserting a need for grand jury transcripts

27       will have a lesser burden in showing justification. In sum, . . . the court's duty in a case of
         this kind is to weigh carefully the competing interests in light of the relevant circumstances

28

1    and the standards announced by this Court. And if disclosure is ordered, the court may
2    include protective limitations on the use of the disclosed material . . . ."

3    <u>Douglas Oil Co. of California</u>, 441 U.S., at 222-23, (emphasis added) (citations omitted).

4    Here, the requested information only involves the instructions given to the grand jurors,[13] not a
5    portion of the grand jury proceedings that invokes the public's interest in secrecy. Further, the statute only
6    requires that Mr. Lopez-Panagua show that a ground may exist.  Rule 6(e)(3)(E)**(ii)** (emphasis added). That
7    showing has been made in this case. The transcript of the grand jury presentment is the only record of these
8    challenged instructions, and thus, must be disclosed under Rule 6(e)(3)(E)(ii).

9    **VI.**

10   **<u>LEAVE TO FILE FURTHER MOTIONS</u>**

11   As information comes to light, due to the government providing additional discovery in response
12   to these motions or an order of this Court, Mr. Lopez-Panagua will almost certainly find it necessary to file
13   further motions. It is, therefore, requested that defense counsel be allowed the opportunity to file further
14   motions based upon information gained through the discovery process.

15   **VII.**

16   **<u>CONCLUSION</u>**

17   For the foregoing reasons, Mr. Lopez-Panagua respectfully requests that the Court grant the above
18   motions.

19   Respectfully submitted,

20   /s/ Kris J. Kraus

21   Dated: August 11, 2008                          **KRIS J. KRAUS**
22                                                   Federal Defenders of San Diego, Inc.
                                                     Attorneys for Mr. Lopez-Panagua

23

24

25

26

27   [13]   Mr. Lopez-Panagua has also made a discovery request for the grand jury transcript concerning the
28   testimony of any witnesses under FED. R. CRIM. P. 26.2. However, the instant memorandum deals with the
     portions of the transcript where the grand jury was instructed on the elements of the offense.